IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HATEM SALEM,<br><br>*Defendant*. | Case No. 1:25-mj-26<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF APPLICATION
FOR CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Volney Young, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. This affidavit is submitted in support of an application for a criminal complaint and arrest warrant charging HATEM SALEM with unlawfully, knowingly, and intentionally combining, conspiring, confederating, and agreeing with others, known and unknown, to unlawfully, knowingly, and intentionally distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of United States Code, Sections 841(a)(1), (b)(1)(A)(viii), and 846.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am cross-designated and have the authority to conduct narcotics trafficking investigations and enforcement activities pursuant to Title 21 of the United States Code.

1

3.     I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since June of 2023. I have attended and graduated from the Federal Law Enforcement Training Centers' (FLETC) Criminal Investigator Training Program (CITP), as well as the HSI Special Agent Training (HSISAT) academy. I am currently assigned to the HSI Office of the Special Agent in Charge in Washington, D.C., Border Enforcement Security Task Force (BEST). Previously, I was employed as an Officer with the United States Secret Service in Washington, D.C. from 2017 to 2023. Based on my training and experience, I am familiar with the conduct of narcotics investigations, recognition of controlled substances, and the measures taken by criminal groups to conceal, smuggle, transport, and distribute such controlled substances. In my experience investigating narcotics offenses, I have become familiar with some of the tactics and methods used by drug traffickers to smuggle and safeguard drugs and to manufacture and distribute drugs. I have been directly involved in cases related to illegal drug smuggling where I have assisted with initial arrests and seized evidence of violations of federal law. In addition, I communicate regularly with other federal, state, and local law enforcement officers who are familiar with the manner in which drug traffickers operate. In addition, based on my training and experience, I am familiar with the methods used by drug traffickers to import and otherwise conceal, smuggle, transport, and distribute illegal narcotics into the United States.

4.     This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by or known to me or the United States. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating individuals. All observations not personally made by me were relayed to me by the individuals who made them or are based

on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

## PROBABLE CAUSE

5. The Homeland Security Investigations DC Border Enforcement Security Task Force (BEST) and the Fairfax County Police Department (FCPD) Narcotics Unit have been investigating a distribution network operating in the Connecticut, Virginia, Maryland, and North Carolina areas. The group, which includes SALEM, distributes quantities of various controlled substances, to include methamphetamine, cocaine, ketamine, 3,4-methylenedioxymethamphetamine (MDMA), and psilocybin in locations throughout those regions.

### A.  Identification of Hatem SALEM

6. Following a 2024 arrest for transportation of a schedule I/II drug, unindicted co-conspirator 1 (hereinafter, "UCC-1") became a confidential informant with law enforcement. UCC-1 is an admitted drug user and distributor.  Apart from the 2024 arrest, UCC-1 has no additional criminal history. UCC-1 has provided information to law enforcement that has been proven true and accurate. With respect to the instant case, UCC-1's information has been corroborated by information obtained from various public databases, physical surveillance, recorded phone calls, and other information obtained during the investigation.  UCC-1 has made statements against UCC-1's own penal interest.  For these reasons, I consider UCC-1 to be reliable.  During interviews with law enforcement, UCC-1 admitted that SALEM was UCC-1's supplier of narcotics.

### B.  Controlled Purchases with SALEM

7. From August 2024 through December 2024, under the direction of investigators, UCC-1 conducted four controlled purchases in the Eastern District of Virginia for various

controlled substances, to include approximately 114 grams of methamphetamine. All controlled purchases were conducted by phone utilizing "Signal," a cellular phone-based application. The phone number used by UCC-1 to contact SALEM is subscribed to Hatem SALEM through Verizon Wireless. All of the below-referenced communications with SALEM were recorded and monitored by investigators.

### i. August 21, 2024 Controlled Purchase

8. On August 21, 2024, investigators met with UCC-1 at a location in the Eastern District of Virginia to conduct a controlled purchase from SALEM. During this meeting, UCC-1 placed a call via Signal to SALEM. During the call, UCC-1 placed an order for various controlled substances—specifically, six grams of ketamine and three grams of "molly," or MDMA. SALEM agreed to ship the order the next day. UCC-1 paid SALEM $900 of law enforcement buy funds via Venmo[1] and SALEM confirmed receipt of this electronic payment by way of text message via Signal.

9. On August 22, 2024, SALEM sent UCC-1 a message via Signal that included a picture of a United Sates Postal Service (USPS) shipping receipt with the tracking number EI9908208\*\*\*\*. On August 23, 2024, the package associated with the USPS tracking number EI9908208\*\*\*\* arrived at a prearranged location in the Eastern District of Virginia. Investigators were present at the time of delivery and thereafter seized the contents of the package.

10. The seized package contained two small individual mylar bags that were wrapped in aluminum foil and paper towels. One bag contained a purple crystalline substance, and the other bag contained a white crystalline substance. The contents of the package were submitted to the

---

[1] Venmo is a mobile payment service that allows users to electronically send money to individuals and businesses via a mobile phone app. Venmo can facilitate payments made from credit cards, debit cards, and linked bank accounts.

4

Department of Homeland Security Laboratories and Scientific Services (hereinafter, "HSI lab"), where analysis confirmed that the substances sold by SALEM contained MDMA and Ketamine.

### ii.    September 10, 2024 Controlled Purchase

11.    On September 9, 2024, UCC-1 was directed to call SALEM and inquire about prices and availability of several different controlled substances for the next purchase. In addition to inquiring about purchasing cocaine and ketamine, UCC-1 asked SALEM about "pressed pills for molly" and "tina." Based on my training and experience, I know that "tina" is a street name for methamphetamine, a Schedule II controlled substance. SALEM told UCC-1 that he sold pressed MDMA pills for $30 each, and further indicated that he needed to check which types of pills he had when he returned home later that day. SALEM also told UCC-1 that "tina" was methamphetamine which he could obtain for "$100 per gram," but potentially $85 per gram if over five grams was purchased.

12.    On September 10, 2024, investigators met with UCC-1 at a location in the Eastern District of Virginia to conduct another controlled purchase from SALEM. During the meeting, UCC-1 placed a call via Signal to SALEM. During this call, UCC-1 placed an order for various controlled substances, specifically, 3.5 grams of Cocaine, 5 grams of Ketamine, 2 pressed pills containing MDMA, and 5 grams of Methamphetamine.

13.    On September 11, 2024, UCC-1 paid SALEM with $1295 of law enforcement buy funds sent electronically via Venmo. On September 12, 2024, SALEM sent UCC-1 a message via Signal with two images of a USPS receipt showing the shipment of a parcel with the tracking number EI7064702****. On September 13, 2024, the USPS parcel identified by tracking number EI7064702**** arrived in the Eastern District of Virginia and was seized by investigators.

14. The contents of the package included four small mylar bags, which were similar to the bags contained in the August 21, 2024, shipment, and one Ziploc bag. The contents of the package were submitted to the HSI lab, where analysis confirmed the various substances sold by SALEM included MDMA, ketamine, and a bag containing a total net weight of 4.97 grams of methamphetamine hydrochloride, a Schedule II controlled substance, with a purity level of 99.6% +/- 2.5%. This result indicates that SALEM sold approximately 4.95 grams of pure methamphetamine to UCC-1.

### iii. October 28, 2024 Controlled Purchase

15. On October 22, 2024, under the direction of investigators, UCC-1 called SALEM via Signal to inquire about the price for an ounce (28 grams) of methamphetamine. SALEM advised UCC-1 that he needed to check with his source of supply regarding the price for methamphetamine. Later on October 22nd, SALEM called UCC-1 back and advised that the price for 28 grams of methamphetamine would be $1960 and the price for 14 grams of methamphetamine would be $1050.

16. On October 28, 2024, investigators met with UCC-1 at a location in the Eastern District of Virginia to conduct a third controlled purchase from SALEM. During the meeting, UCC-1 placed a call via Signal to SALEM and placed an order for various controlled substances, to include 28 grams of Methamphetamine, five grams of ketamine, 3.5 grams of cocaine and 10 psilocybin gummies. UCC-1 paid SALEM $2,827 of law enforcement buy funds via Venmo.

17. On October 29, 2024, investigators conducted surveillance of SALEM in the District of Connecticut, specifically in and around Bridgeport, Connecticut. On October 29th around 3:32 PM, investigators observed SALEM leaving a prior residence with a white object in his hand and getting into his vehicle. Surveillance followed SALEM directly from his residence to

the Bayview United States Post Office located at 115 Boston Ave, Bridgeport, CT. This was the same post office from which SALEM mailed the parcels seized on August 21 and September 10, 2024. SALEM was observed entering the post office while holding the white object that was in his possession when he exited his residence. When SALEM exited the post office, he no longer had the white object in his possession. Shortly after investigators observed SALEM leave the post office, SALEM sent UCC-1 an image of a receipt via Signal for a parcel bearing tracking number ER1252736****.

18. On October 31, 2024, the USPS parcel identified by the tracking number ER1252736**** arrived in the Eastern District of Virginia and was seized by investigators. The package contained three individual mylar bags, one plastic bag, and one vacuum sealed bag, wrapped in paper towels and aluminum foil. The contents of the package were submitted to the HSI lab, where analysis confirmed the various substances sold by SALEM included a bag containing a total net weight of 27.43 +/- 0.14 grams of methamphetamine hydrochloride, a Schedule II controlled substance, with a purity level of 99.5% +/- 2.5%. This result indicates that SALEM sold approximately 27.29 grams of pure methamphetamine to UCC-1.

### iv. December 2, 2024 Controlled Purchase

19. On December 2, 2024, investigators met with UCC-1 at a location in the Eastern District of Virginia to conduct a fourth controlled purchase from SALEM. During the meeting, UCC-1 placed a call via Signal to SALEM and ordered various controlled substances, including 84 grams of Methamphetamine, five grams of ketamine, and 3.5 grams of cocaine.

20. During the monitored phone calls between SALEM and UCC-1, SALEM advised that he had to check with an unindicted co-conspirator regarding the price of the methamphetamine. SALEM later confirmed that his co-conspirator would supply 84 grams of

methamphetamine for $65 per gram, for a total of $5,450. SALEM indicated that he would go retrieve the methamphetamine the next morning and send it the next day.

21. UCC-1 paid SALEM $6,273 of law enforcement buy funds via Venmo, CashApp, and Zelle for the purchase.[2] SALEM had previously requested that UCC-1 split the payment for this purchase between various electronic payment platforms in order to avoid unwanted attention to the transactions.

22. Law enforcement surveillance conducted in Bridgeport, Connecticut following UCC-1's controlled call to SALEM revealed that unindicted co-conspirator 2 ("UCC-2") assisted SALEM in mailing UCC-1's December 2nd order to the Eastern District of Virginia. On December 3, 2025, while SALEM was away from his residence, UCC-2 was observed exiting the residence at 1:14PM. Subsequently, at 2:37PM on the same day, SALEM sent UCC-1 a screenshot of a receipt for a parcel that was shipped at 1:55 PM with a tracking number of EI9295657****. The contact name on the screenshot is similar to a nickname that SALEM frequently uses when referencing UCC-2. Law enforcement surveillance confirmed that SALEM did not go to a post office between the hours of 8:05AM and 4:55PM on December 3, 2024; therefore, he could not have mailed the aforementioned parcel.

23. On December 05, 2024, the above-referenced USPS parcel identified by the tracking number EI9295657**** arrived in the Eastern District of Virginia and was seized by investigators. The package contained four individual mylar bags, each sealed in a vacuum sealed bag, wrapped in tissue paper, aluminum foil, and then brown paper. The contents of the package were submitted to the HSI lab, where analysis confirmed that three of the bags

---

[2] Like Venmo, Cash App and Zelle are also mobile applications used to transfer money electronically between users.

contained a total net weight of 83.83 grams of methamphetamine hydrochloride, a Schedule II controlled substance, with a purity level of 97.8% +/- 2.5%. This result indicates that SALEM sold 81.99 grams of pure methamphetamine to UCC-1.

## CONCLUSION

24.  Based on the foregoing, I submit that there is probable cause that starting from at least September 2024 through the present, within the Eastern District of Virginia and elsewhere, HATEM SALEM unlawfully, knowingly, and intentionally combined, conspired, confederated, and agreed with others, known and unknown, to unlawfully, knowingly, and intentionally distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of United States Code, Sections 841(a)(1), (b)(1)(A)(viii), and 846.

Respectfully submitted,

*V. Young*

Special Agent Volney Young
Homeland Security Investigations

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on January 27, 2025:

_____
Hon. Lindsey R. Vaala
United States Magistrate Judge

9